# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MICHAEL TRUESDALE, )
)
         Plaintiff, )
) Case No. 04 C 7132
vs. ) Magistrate Judge Schenkier
)
MAINE TOWNSHIP HIGH )
SCHOOL DISTRICT #207, )
)
         Defendant. )

## MEMORANDUM OPINION AND ORDER[1]

Maine Township High School District #207 ("defendant" or "District" or "District 207"), has

filed a motion seeking summary judgment on the sole claim asserted by Michael Truesdale

("plaintiff") in his complaint: a claim that his termination from employment violated the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (doc. # 26). For the reasons

that follow, the Court grants the defendant's motion for summary judgment.

### I.

Summary judgment is proper if the record shows that there is no genuine issue as to any

material fact, and that the moving parties are entitled to judgment as a matter of law. Fed. R. Civ.

P. 56(c); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). With regard to factual issues,

a genuine issue for trial exists when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct.

2505, 91 L.Ed.2d 202 (1986). If the evidence is merely colorable, or is not significantly probative,

---

[1]By the parties' consent and pursuant to 28 U.S.C. § 636(c)(1) and Northern District of Illinois Local Rule
73.1(b), on April 7, 2005, this case was reassigned to this Court, for all proceedings, including the entry of final judgment
(doc. # 9).

summary judgment may be granted. *Id.* at 249-50; *Tri-Gen Inc. v. Int'l Union of Operating Engineers*, 433 F.3d 1024, 1030 (7th Cir. 2006).

In deciding a motion for summary judgment, the Court must view all evidence in the light most favorable to the nonmoving party, and must draw all reasonable inferences in the nonmovant's favor. *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1012 (7th Cir. 2006). *Chortek v. City of Milwaukee*, 356 F.3d 740, 745 (7th Cir. 2004). When a material fact or a set of facts yields competing, but reasonable, inferences, then there is a genuine issue that precludes summary judgment. The non-moving party's burden is to identify facts that are both material and genuinely disputed. *Celotex*, 477 U.S. at 324. To be material, a fact must be able to affect the outcome under the substantive law governing the motion. *Smith v. Potter*, 445 F.3d 1000, 1006 (7th Cir. 2006); *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598-99 (7th Cir. 2000).

To establish a genuine issue, the party opposing the motion for summary judgment must serve and file, pursuant to Local Rule 56.1, a concise statement outlining genuine disputes of material fact that require denial of summary judgment, supported by citations to the evidentiary materials that support those denials (*e.g.*, affidavits, depositions, answers to interrogatories, admissions etc.). Although the party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact, *Celotex*, 477 U.S. at 323, the non-moving party cannot rely upon the pleadings alone, but must use the evidentiary tools outlined above to identify the material facts that show there is a genuine issue for trial. *Id.* at 324; *Insolia*, 216 F.3d at 598.

Given these legal standards, we now address the undisputed, material facts; we do not address those undisputed facts that are not material to the outcome of this motion.

2

# II.

District 207 consists of three high schools: Maine Township High School South ("Maine South"), Maine Township High School West ("Maine West"), and Maine Township High School East ("Maine East") (Def.'s Rule 56.1 Statement of Undisputed Facts ("DSOF") ¶ 1). The Applied Arts and Technologies Department ("AATD") offers classes in automotives, computer assisted drawing (also known as CAD), business and customer sciences (*Id.* ¶ 4).

Mr. Truesdale began his employment with District 207 during the 2001-02 school year (DSOF ¶ 2). Mr. Truesdale was born on May 3, 1953 (*Id.*); thus, he was 48 years old when he began his employment with District 207. During the plaintiff's employment with District 207, he was assigned to the AATD and taught two classes of Auto Fundamentals and one class of Auto Service at Maine South, and one class of Auto Fundamentals at Maine West (*Id.* ¶¶ 3-7).

Mr. Truesdale taught in District 207 for three school terms, ending with the 2003-04 school year. During his period of employment, Mr. Truesdale was a non-tenured teacher (DSOF ¶ 23). At the conclusion of the 2003-04 school year, District 207 decided not to recall Mr. Truesdale, and he thus was released from his employment with District 207 (*Id.* ¶¶ 40, 45). At the time of that decision, Mr. Truesdale was 50 years old (*Id.* ¶ 2).

## A. The 2003-2004 School Year.

During the 2003-2004 school year, David Claypool served as the Principal of Maine South (DSOF ¶ 22). Mr. Claypool was born on February 1, 1960, and turned 44 years old during the 2003-04 term (*Id.*).[2] Dr. Patricia Duggan, age 50, served as the Department Chair for the AATD during

---

[2]Defendant's fact statement on this point, which plaintiff did not dispute, places Mr. Claypool's age during that term as 46 years old, which plainly is wrong if his birthdate was February 1, 1960. The deposition testimony on which this statement is based confirms that date of birth, which means that Mr. Claypool turned 44 years old during the 2003-04

3

this term (*Id.* ¶ 21). Dr. Duggan was born on July 18, 1953 (*Id.*). Ms. Kara Kendrick was a Dean of Students at Maine South during the 2003-04 school term. She was responsible for discipline and other student-related issues (*Id.* ¶ 28). Ms. Kendrick was born on September 2, 1973; she was 30 years old during the 2003-04 term (App. Tab D, Kendrick Dep. at 6). At all relevant times, Ms. Kendrick reported to Mr. Claypool (*Id.* at 7).

During the 2003-04 school year, District 207 utilized a "Staff Evaluation Plan-1995" (hereinafter "the Plan") to evaluate non-tenured teachers (DSOF ¶ 15). The Plan required that non-tenured staff be observed during a one-hour class period at least two times per year (*Id.*). In addition to those observations, each non-tenured teacher was subject to an annual "summative evaluation" of the teacher's performance (*Id.* ¶ 16). The summative evaluation covered four categories: teaching; human relations; professional development; and non-teaching responsibilities (*Id.* ¶ 18). The evaluation set forth specific requirements and tasks for each of the four categories (*Id.*). Once the summative evaluation was completed, the evaluator, typically the non-tenured teacher's department chair, met with the non-tenured teacher to discuss the summative evaluation prior to its submission by the school principal to the District's superintendent (*Id.* ¶ 17).

The summative evaluation provided an indication as to whether the teacher will be recalled by District 207 (DSOF ¶ 19). Recall for a non-tenured teacher is governed by the Illinois School Code, and local school districts are not required to provide any reason for the retention or decision not to recall a non-tenured teacher (*Id.*).

school term.

4

## B. Plaintiff's 2003-04 Summative Evaluation.

During the 2003-2004 school year, plaintiff was a non-tenured teacher, and thus was subject to the Plan. Consequently, Dr. Duggan, as the department chair, observed plaintiff's classroom instruction and evaluated his performance in the four summative plan areas. Dr. Duggan rated plaintiff satisfactory in three of the four categories: teaching, professional development and non-teaching responsibilities. Dr. Duggan did not give plaintiff a satisfactory rating in the area of human relations (*Id.* ¶ 23).[3]

On February 13, 2004, Dr. Duggan prepared and signed a summative evaluation for plaintiff, recommending that he not be retained for the following school year due to an unsatisfactory evaluation in the area of human relations (Def.'s App. Tab C, Duggan Dep. at 124, 126-27; Def.'s App. Tab J (Dep. Ex. 13 (Evaluation dated 02/13/04)). Mr. Claypool, the Principal, signed this document on the same day. The document also was signed by the Assistant Principal, Mr. Greg E. Dietz, on February 16, 2004, and the Superintendent, Steve Snider, on May 11, 2004.

The summative evaluation did not explain the basis for the determination; it merely indicated that the decision not to recall had been made. However, the evaluation stated that Mr. Truesdale's performance in the area of human relations was unsatisfactory, citing to: (a) plaintiff's use of sarcasm; (b) "written consequences" as a disciplinary tool; and (c) a January 9, 2004 incident with

---

[3]The plaintiff was rated as either excellent or satisfactory in all four categories in his 2002 and 2003 year end summative evaluation by Mike Ritter, the Department Chair for the AATD at that time (Plaintiff's Statement of Additional Facts ("PSAF") ¶ 4). However, this information is immaterial for purposes of summary judgment since, in this case, we consider the time of discharge the relevant time frame under the ADEA. *Grayson v. O'Neill,* 308 F.3d 808, 818 (7th Cir. 2002). *See* discussion at 16 *infra.*

Student Doe 1, where physical force/pushing had occurred in a hallway outside the classroom (Def.'s

App. Tab J).

Dr. Duggan described Mr. Truesdale's deficiencies in the area of human relations as follows:

An area of significant concern in the human relations category deals with Mr. Truesdale's communication and interpersonal skills with students. There have been times during this evaluation period when Mr. Truesdale used sarcasm with his students in dealing with classroom conduct and inappropriate behavior. In discussions with his department chair, Mr. Truesdale has been instructed to address his students in a respectful manner to promote students' self-esteem and maintain a positive learning environment.

In addition, Mr. Truesdale . . . has required students to do written consequences for inappropriate behavior. Such consequences are unproductive ways to change student behavior. In a follow-up discussion with his department chair he was directed to use intervention reports and work more closely with the Dean's office to address behavior concerns and appropriate behavior consequences.

[Finally] in a January 9 classroom incident, Mr. Truesdale used physical force in dealing with a disruptive student. In this situation Mr. Truesdale pushed the classroom door open even though he knew the student was barring the door from the opposite side. Mr. Truesdale's push resulted in the student being pushed toward the middle of the hallway. In discussing the classroom incident, the department chair informed Mr. Truesdale that such action was unacceptable and that physical force is never an appropriate response. The department chair indicated that security should have been called to remove the student immediately. This incident was discussed on January 28 in a meeting with Mr. Dietz, Assistant Principal, and the department chair.

(Def.'s App. Tab J, at 2).

The other evidence from the record – primarily deposition testimony and written memoranda

to plaintiff's employment file (discussed below) – indicates that these stated problems all were

contemporaneously discussed and documented by Dr. Duggan and Ms. Kendrick. The Court finds

that the deposition testimony of Dr. Duggan and Ms. Kendrick is unrebutted, despite plaintiff's

attempt to create genuine disputes with his own testimony of contrary recollections of certain facts

within each major category of District 207's concern.[4] The following undisputed facts regarding District 207's three areas of concern are summarized below.

## 1. Sarcasm.

On January 28, 2004, Dr. Duggan wrote a memorandum to plaintiff, in which she summarized Student Doe I's "accusation" about the use of "physical force" on January 9, 2004, as well as the accusation that plaintiff "had been sarcastic and demeaning to him in front of other students" on that day (Def.'s App. Tab I). In that memorandum, Dr. Duggan also summarized her meeting with plaintiff on January 14, 2004. She indicated that during that meeting, plaintiff admitted he told the student he was "immature" and had teased him about his "limited knowledge of autos." According to Dr. Duggan, plaintiff further admitted that he "might have called him a 'smart ass'" (*Id.*). Dr. Duggan wrote in her memorandum that she advised Mr. Truesdale that the use of sarcasm in the classroom was inappropriate.

The plaintiff did not respond to this memorandum in writing or otherwise, until after he received notice of his termination (Def.'s App. Tab E, Truesdale Dep. at 87). In his deposition, plaintiff admitted that he called the student "immature" and "might have called him a smart ass," but he did not remember teasing him about a limited knowledge of autos (*Id.* at 85-86). The plaintiff

---

[4]At most, plaintiff told Dr. Duggan, with respect to the January 9, 2004 incident with Student Doe I, that he did not know the student was on the other side of the door when he opened it (Def.'s App. Tab H); that his use of written consequences was limited and that he stopped using them after the October 29 meeting in his classroom with Dean Kendrick, as she instructed (Def.'s App. E, Truesdale Dep. at 61-64); and that his use of sarcasm was more limited than alleged, *i.e.,* he "might" have called a student a "smart ass," and he admits to telling the student he was "immature" in front of the rest of the class; but, he denies any "teasing" related to the inability to answer questions about automotives (*Id.*, at 85-86). The Court finds these asserted disputes immaterial for purposes of determining whether plaintiff has satisfied the "legitimate employment expectations" element of the *prima facie* case under the ADEA, for the reasons discussed *infra*.

7

also acknowledged that Dr. Duggan warned him about using sarcasm and ridicule toward students (*Id.* at 86).

The record also contains testimony describing plaintiff's use of sarcasm toward Student Doe 1 and another student in his classroom on two previous occasions. For example, in November 2003, Student Doe 1's father called Ms. Kendrick to "register a complaint" that plaintiff had been sarcastic to his son by stating "tell me everything you know in five seconds" about automotives, and "I bet that's all the time you need" (PSAF ¶¶ 32, 34; Response ¶34 (citing Pl.'s Tab W, Kendrick Dep. at 23)). In addition, Student Doe 2 alleged that, in the fall of 2003, plaintiff "teased" him in class because he did not have a clear understanding of automotives (Def.'s App. Tab D, Kendrick Dep. at 18-19).[5] Ms. Kendrick testified that she spoke with plaintiff about this incident by phone in November 2003, and they had e-mail dialogue about removing Student Doe 2 from plaintiff's class (*Id.,* at 25; Pl.'s Tab G, 11/18/03 Memo from Truesdale to Kendrick)). Dr. Duggan also spoke with Mr. Truesdale about his use of sarcasm with Student Doe 2 in the fall of 2003 (Def.'s App. Tab C, Duggan Dep. at 38-41).

District 207 does not maintain any written policies or procedures prohibiting a teacher from using sarcasm in their classroom. District 207's Applied Arts teachers were not generally instructed on the prohibition of sarcasm (PSAF ¶ 40). Ms. Kendrick testified that she did not recall any other student complaints that other teachers had been sarcastic or teased them during the 2003-04 school

---

[5]The student also complained plaintiff would not allow him into lab (PSAF ¶ 44; PSAF Response ¶ 44; Pl.'s Tab W, Kendrick Dep. at 18-20, 25). An e-mail from plaintiff to Ms. Kendrick, dated November 18, 2003, indicated plaintiff's desire to drop Student Doe 2 from his class for failure to complete assignments and behavior issues (Tab G). In response, Ms. Kendrick denied the request and encouraged plaintiff to write up behavior issues (*Id.*). However, during the second semester, Student Doe 2 was removed by defendant's Special Education staff from plaintiff's class (Pl.'s Tab W, Kendrick Dep. at 21).

year (Def.'s App. Tab D, Kendrick Dep. at 22). Dr. Duggan also did not recall any other incidents of sarcasm by any other teachers during that school term (Def.'s App. Tab C, Duggan Dep. at 128).

## 2. Written Consequences.

During the 2003-2004 school year, plaintiff assigned "written consequences" as a form of discipline to students who did not comply with plaintiff's classroom rules (DSOF ¶¶ 28, 29; PSAF ¶¶ 37, 38). "Written consequences" meant that a student would have to write out on paper "x" number of times something related to what he or she should or should not be doing while they were in class (e.g., "I will wear safety glasses when I'm using a grinder") (Def.'s App. Tab 4, Truesdale Dep. at 62).

Sometime between August and October 29, 2003, Ms. Kendrick learned that plaintiff had assigned written consequences as a form of discipline (DSOF ¶ 28; Def.'s Tab G, 10/30/03 Kendrick Memo). On October 29, 2003, Ms. Kendrick went to the auto shop to discuss with plaintiff a student who had been sent to her office by plaintiff to complete a written consequence the week before (Id.). Prior to the October 29, 2003 meeting, Ms. Kendrick had directed plaintiff to cease using written consequences (Id.). During the October 29 visit, Ms. Kendrick saw a list of student names on the board with "written consequences" assigned to them (Def.'s App. Tab D, Kendrick Dep. at 33). Ms. Kendrick asked plaintiff about the names (id.), and plaintiff explained that these were consequences assigned before she had told him to stop using that form of discipline (Def.'s App. Tab E, Truesdale Dep. at 61).

After this conversation, Ms. Kendrick sent a memorandum to plaintiff, dated October 30, 2003, stating that she was "disappointed to see that the 'written consequences' were still being used" despite her instruction to cease using them "after ... two previous discussions" (PSAF ¶ 39; Def.'s

9

App. Tab E, Truesdale Dep. at 63; Def.'s App. Tab G, Kendrick Memorandum). The plaintiff never wrote a memorandum indicating disagreement with the Kendrick memorandum (Def.'s App. Tab E, Truesdale Dep. at 63); nor did plaintiff ever talk to Ms. Kendrick about his belief that there were not two previous discussions about written consequences (*Id.*).

Shortly after the Kendrick memorandum, Dr. Duggan called plaintiff to her office and raised the issue of his use of written consequences. Dr. Duggan informed plaintiff that this was not an appropriate form of discipline and advised him to discontinue the practice (*Id.*; PSAF ¶ 37). According to plaintiff, Dr. Duggan announced that her "new model" was "clean or dean," which meant that plaintiff was to give students clean up assignments or send them to the dean's office if there was a discipline problem (Def.'s App. Tab E, Truesdale Dep. at 63-64). There was no written policy prohibiting the use of written consequences (PSAF ¶ 40).

### 3. January 9, 2004 Incident.

On January 9, 2004, Mr. Truesdale sent two students, Student Doe 1 and Student Eyewitness, into the hallway to complete a quiz because they were being disruptive in the classroom (PSAF ¶ 17). Student Doe 1 is the individual whom, on that day, plaintiff called a "smart ass," an episode that led to Mr. Truesdale being criticized for the use of sarcasm.[6]

While in the hallway, the students remained disruptive (PSAF ¶ 18). According to plaintiff's initial account, he tried to open the door, but he could not open it because it was stuck; he then leaned against it, and he was able to open it (*Id.* ¶¶ 18, 19). Once the door was opened, the plaintiff realized that one of the students was hunched over right outside the door (*Id.*). The plaintiff then

---

[6]Student Doe 1 and plaintiff had problems that predated the January 9, 2004 encounter. Plaintiff had sent Student Doe 1 to the Dean's office on two previous occasions: December 3, 2003, and November 21, 2003 (PSAF ¶ 43).

pushed the door completely open, which caused Student Doe 1 to end up in the middle of the hallway (*Id.*). Plaintiff immediately sent Student Doe 1 to Ms. Kendrick's office (*Id.* ¶ 18). Immediately after the incident, plaintiff drafted an incident report along with a typed version of the facts (*Id.* ¶ 21; Pl.'s Tab A (01/09/04 Incident Report) and B (written summary)).

Ms. Kendrick interviewed the two students. Student Doe 1 alleged that plaintiff hit him and there had been a verbal altercation. Ms. Kendrick then obtained a statement from the Student Eyewitness; this student did not confirm Student Doe 1's story. Ms. Kendrick called Student Doe 1's father to inform him of the incident, and she told him that the Student Eyewitness had not corroborated the story told by Student Doe 1 (PSAF ¶ 20).

The next day, Ms. Kendrick received and read plaintiff's written account of the incident (PSAF ¶ 22). Shortly thereafter, Dr. Duggan spoke with Ms. Kendrick about the incident; and she reviewed plaintiff's report of the episode (PSAF ¶ 23).

On Wednesday, January 14, 2004, Dr. Duggan met with plaintiff to discuss the events; she created a separate, written report of this meeting, dated January 28, 2004 (*Id.* ¶ 24; Def.'s App. Tab H). According to Dr. Duggan's written report of this meeting, dated January 14, 2004, plaintiff made the following statements to her:

> as [Student Doe 1] left the room he yelled out something and proceeded into the hallway. Once he was outside the closed door, [plaintiff] continued to be disruptive in the hallway. When [plaintiff] went to open the door to go out into the hallway the door was stuck so he pushed it. He then realized that [Student Doe 1] was hunched in front of the door with his foot up against the door. At that time, [plaintiff] indicated that he pushed the door open causing [Student Doe 1] to be pushed toward the middle of the hallway. [Plaintiff] stated that [Student Doe 1] was "impeding my progress in getting into the hallway."

11

(PSAF ¶ 27 (citing Def.'s App. Tab C, Duggan 83, 90; Def.'s App. Tab H)). Thus, in Dr. Duggan's recounting of these events, Mr. Truesdale told her that he had intentionally continued to open the door when he knew Student Doe 1 was in its path. In her memorandum, Dr. Duggan warned Mr. Truesdale about the use of physical contact with students and indicated concern about the hallway incident (PSAF 30; Def.'s App. Tab I). She warned him that "any further incidents of inappropriate physical contact with students" would "likely result in further discipline, which could include suspension without pay or dismissal" (*Id.*). Although plaintiff was given the opportunity to contest Dr. Duggan's written summary of what plaintiff said, he did not do so until after the termination decision had been made and announced to him (Def.'s App. Tab E, Truesdale Dep. at 87).

## C. Termination Meeting.

On February 13, 2004, Mr. Claypool and Ms. Duggan met with plaintiff to present his summative evaluation and to inform plaintiff that he would not be recalled for the 2004-05 school year (DSOF ¶ 43); the parties also met a second time, on March 4, 2004, to discuss the summative evaluation (DSOF ¶ 44; Def.'s App. Tab E, Truesdale Dep. at 103). In keeping with the recommendation of Mr. Claypool and Dr. Duggan, the Board of Education resolved on March 8, 2004, to release plaintiff (DSOF ¶ 45; Def.'s App. Tab B, Dresen Dep. at 43).

At the time of plaintiff's termination, there were two tenured teachers who taught automotive classes at Maine South in the AATD and who reported to Dr. Duggan and Mr. Claypool: David Inserra and Bill Thieme (PSAF ¶¶ 13, 16). Mr. Inserra was born on January 19, 1967, and is approximately 14 years younger than plaintiff (PSAF ¶ 16). Mr. Thieme was born on March 6, 1965, and is almost 12 years younger than plaintiff (PSAF ¶ 13).

Mr. Thieme testified that during the 2003-04 school year, he used sarcasm in his classroom, but he was not criticized for it. Mr. Thieme also testified that he had classroom management problems with Ms. Kendrick (PSAF ¶ 14). Mr. Thieme further testified that he reported these problems to Dr. Duggan prior to plaintiff's termination (*Id.*, ¶ 15). Defendant admits that it was aware that Mr. Thieme had a conversation with Dr. Duggan about the AATD's relationship with Ms. Kendrick, but it denies that it had any knowledge of Mr. Thieme's self-admitted use of sarcasm in the classroom. And, Mr. Truesdale has cited no evidence to show that defendant had that knowledge (Def.'s Response to PSAF ¶¶ 14, 15). During the 2003-04 school year, a student made an allegation of physical contact by Mr. Inserra. Two student eyewitnesses did not corroborate the story. The District investigated the incident, but it later dropped the matter for lack of evidence (PSAF ¶ 16).

### D. Plaintiff's Replacements.

Two teachers were hired to replace plaintiff (DSOF ¶ 46). The District hired Dennis Ruedel, as an Applied Arts and Technologies teacher. Mr. Ruedel's date of birth is May 27, 1962; he is nine years younger than plaintiff (*Id.*). The District also hired Bruce Moore as an Applied Arts and Technologies Teacher. Mr. Moore's date of birth is August 10, 1953 (*Id.*), and he is thus the same age as plaintiff.

As indicated previously, at the time of plaintiff's termination, Mr. Truesdale was teaching one class of Auto Service and two classes of Auto Fundamentals at Maine South. Mr. Ruedel took over plaintiff's courses at Maine South (PSAF ¶ 9; DSOF ¶ 46), as well as an additional third class

of auto fundamentals (DSOF ¶ 46).[7]  Mr. Moore was assigned to teach Auto Fundamentals (Pl.'s Index Tab L), but the record does not indicate at which high school he taught.

## III.

To survive summary judgment, a plaintiff must "set forth *specific facts* showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 248 (emphasis added). In this case, the Court has found the facts set forth above to be material and undisputed. These undisputed facts defeat plaintiff's ADEA claim.

Plaintiff does not offer direct evidence of age discrimination; he thus seeks to defeat summary judgment by use of the indirect method of proof. The indirect method of proof makes use of the well-established burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), which applies in Title VII cases. This burden-shifting framework also applies in ADEA cases, at least when the parties do not dispute it, *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 142 (2000), and all parties agree that this framework applies here. The *McDonnell Douglas* framework begins with a plaintiff being required to offer evidence that could establish a *prima facie* case, which would raise an inference of cognizable discrimination.

To establish a *prima facie* case of discrimination under the ADEA, a plaintiff must offer evidence showing that s/he: (1) is at least forty years old; (2) met the employer's legitimate job performance expectations; (3) experienced an adverse employment action; and (4) was replaced by or treated differently than a person substantially younger, *Johnson v. Zema Systems Corp.,* 170 F.3d

---

[7] We note that Mr. Ruedel resigned after his March 4, 2005, summative evaluation meeting, when he was told by Mr. Claypool that he would not be recalled (PSAF ¶ 10). Mr. Ruedel was replaced, in part, by Mr. Ben May, who was more than 30 years younger than plaintiff (PSAF ¶ 11). Mr. May taught two of Mr. Ruedel's classes in Auto Fundamentals (*Id.*); the other two classes were divided between Barry Bianco, a tenured teacher, who taught Auto Services, and Thomas Krause, whose date of birth is February 3, 1977, and is thus 24 years younger than plaintiff; he taught Auto Fundamentals. However, for the reasons expressed *infra,* we do not find these facts to be material.

14

734, 746 (7th Cir. 1999), or other such evidence that indicates that it is "more likely than not that his age . . . was the reason for the discharge." *Robin v. Espo Eng'g Corp.,* 200 F.3d 1081, 1089-90 (7th Cir. 2000). *See also O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 313 (1996) ("[T]he fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class."). Plaintiff's failure to make the required showing on any element of the *prima facie* case will result in summary judgment for the defendant. *Bio v. Federal Express Corp.,* 424 F.3d 593, 596 (7th Cir. 2005) ("The failure to establish any one of the initial four elements [of a prima facie case] defeats a discrimination claim").

Here, Mr. Truesdale has offered sufficient evidence on the first and third elements. However, the undisputed, material facts do not create a triable issue on the second or fourth elements. Although a plaintiff's failure to satisfy even one *prima facie* element obviates the need for a further analysis, *Johnson v. ExxonMobil Corp.,* 426 F.3d 887, 892 (7th Cir. 2005), the Court will address both the second and fourth elements. We will begin with the second element of legitimate job expectations.

## A.

As a threshold matter, the Court's "inquiry into the issue of legitimate expectations is more aptly characterized as 'simply *bona fide* expectations, for it is no business of a court in a discrimination case to decide whether an employer demands 'too much' of his workers.'" *Robin,* 200 F.3d at 1090 (quoting *Coco v. Elmwood Care, Inc.,* 128 F.3d 1177, 1179 (7th Cir. 1997)). In other words, so long as the employer's employment expectations are "in good faith[,] without fraud or

15

deceit," *Blacks Law Dictionary* 168 (7[th] ed. 1999), we only determine if the employee met them. *Robin*, 200 F.3d at 1090.

District 207's legitimate expectations must be measured at the time of discharge. *See Biolchini v. General Elec. Co.*, 167 F.3d 1151, 1153-54 (7th Cir. 1999). *See also Grayson v. O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002) (prior record immaterial; issue is whether employee was meeting employer's legitimate expectations at the time of discharge). The fact that plaintiff apparently met District 207's job performance requirements in prior years did not immunize him from criticism for his job performance in 2003-04. Nor does it create a triable issue as to whether he continued to meet District 207's legitimate job performance requirements in 2003-04. The quality of an employee's performance may change over time. *Biolchini*, 167 F.3d at 1154. And, the people who evaluate that performance may change as well, as was the case here: the persons who evaluated Mr. Truesdale in 2003-04 were not the same people who did so in earlier years.

We therefore focus on the plaintiff's performance during the relevant school term of 2003-04. We note at the outset that plaintiff concedes that because he was an at-will, non-tenured employee, "the district did not have to give a reason for my not being rehired" (Pl.'s Tab C, at 1 (Memorandum dated 03/05/04)). Moreover, in his deposition testimony, he states: "As a third-year nontenured teacher, [the District] really didn't have to come up with any [reason]" (Def.'s App. Tab E, at 111). Of course, while District 207 did not have to have any reason to terminate Mr. Truesdale, it was prohibited by the ADEA from having an age-based reason. However, the plaintiff's failure to establish the second (and fourth) prong of his *prima facie* case shows that he has presented no triable ADEA issue.

16

District 207 asserts that during the 2003-04 school term, plaintiff was not satisfying its legitimate expectations in the human relations area. As plaintiff admits in his deposition, the reasons given to him for his discharge were contained in the human relations portion of his 2004 year end summative evaluation (Def.'s App. Tab E, Truesdale Dep. at 111-112). Plaintiff does not deny that the incidents the District cites as unsatisfactory occurred; he simply disputes some of the details regarding those incidents.

The Court finds no evidence to indicate that the District's reasons for terminating plaintiff were not *bona fide*. *First,* there are contemporaneously documented incidents where plaintiff used written consequences, sarcasm and–at best poor judgment and at worst physical force–to deal with student behavior. *Second,* although plaintiff offered some testimony disputing some of the characterizations and/or frequency of the incidents described in the documented evaluations of these incidents, the plaintiff's own admissions corroborate these memoranda. Notably, plaintiff does not deny that the January 9 incident with Student Doe 1 occurred (*i.e.,* that he continued to push the door open after he knew Student Doe 1 was on the other side of it), and that he used both sarcasm and written consequences. *Third,* the plaintiff also admits he was warned by both Ms. Kendrick and Ms. Duggan not to engage in such behavior. Moreover, although plaintiff denied using written consequences after Ms. Kendrick warned him about it, the plaintiff did not rebut the Ms. Kendrick's October 30 memorandum which stated that Ms. Kendrick had warned plaintiff two times prior to the October 29, 2003 meeting. The Court finds this undisputed evidence sufficient to establish that plaintiff was not meeting District 207's legitimate job expectations.

17

**B.**

The fourth element of the *prima facie* case requires that plaintiff point to evidence that he was replaced by persons substantially younger, or that otherwise shows that his age was the reason for his discharge. The term "substantially younger" means generally ten or more years younger. *See Hartley v. Wisconsin Bell, Inc.,* 124 F.3d 887, 893 (7th Cir. 1997). Where the disparity is ten years or more, there is a presumption that the fourth factor is met. *Id.* at 893. Where the disparity is less than ten years, "the plaintiff still may present a triable claim if [s]he directs the court to evidence that her employer considered her age to be significant." *Id.*

> Ten years is a reasonable threshold establishing a "significant" and "substantial" gap, which is what *O'Connor* demands. Yet the line we draw is not so bright as to exclude cases where the gap is smaller but evidence nevertheless reveals the employer's decision to be motivated by the plaintiff's age.

124 F.3d at 893.

Here, the persons who replaced Mr. Truesdale did not meet the 10-year threshold: one was nine years younger (Mr. Ruedel) and the other was the same age as plaintiff (Mr. Moore). Moreover, as in *Hartley,* the plaintiff does not present the Court with other circumstantial evidence sufficient to raise an inference of age discrimination. The record reveals no evidence that the primary decision makers, Mr. Claypool and Dr. Duggan, viewed plaintiff's age to be significant in determining whether to recall him. Both decision-makers were in the protected ADEA age group: Mr. Claypool was 44 years old, and Mr. Duggan was 50 years old. Moreover, it is undisputed that District 207 did not consider salary in deciding which teachers to hire or retain, but instead sought to employ the best teachers possible (DSOF ¶¶ 11-12, 14). Thus, Mr. Truesdale cannot argue that salary was used as a proxy for age in his termination decision. And, we note that Mr. Truesdale was first hired by

District 207 for the 2001-02 school year, when Mr. Truesdale was 48 years old. The fact that he was in the ADEA protected class when first hired, and then terminated only a few years later, undermines an inference that age was involved in either decision.[8]

Plaintiff argues that he has created a triable issue because District 207 allegedly treated two other employees, similarly situated to him, Bill Thieme and David Inserra, more favorably because they were younger. In considering whether two employees are similarly situated, a court must consider whether the evidence shows that the employees' performance was comparable (Def.'s Reply at 10). *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006). In addition, similarly situated employees must be subject to the same terms and conditions of employment as the plaintiff. *See Ajayi v. Aramark Business Services, Inc.*, 336 F.3d 520, 532 (7th Cir. 2003).

Here, neither Mr. Inserra nor Mr. Thieme were similarly situated to Mr. Truesdale because they, unlike plaintiff, are tenured teachers and therefore were subject to different standards of review than plaintiff, especially regarding evaluations, discipline and dismissal (Pl.'s App. X, Claypool Dep. at 61; Pl.'s App. AA, Thieme Dep. at 5; 105 ILCS 5/24-12; 105 ILCS 5/24-11). Messrs. Inserra and

---

[8]Plaintiff argues that Dr. Duggan, age 50, was simply the "cat's paw" of Ms. Kendrick, age 30, at the time of plaintiff's discharge (Pl.'s Mem. at 15). Put another way, plaintiff argues that Dr. Duggan's actions were driven by information from Ms. Kendrick, whom plaintiff says harbored age-based animus toward him. The problem with this argument is two-fold. *First,* plaintiff has failed to point to evidence that Ms. Kendrick herself acted on the basis of plaintiff's age. Indeed, the evidence that Mr. Theime (who was younger than 40 years old) also had difficulties with Ms. Kendrick is inconsistent with the proposition that Ms. Kendrick targeted plaintiff due to his age.

*Second,* plaintiff has failed to show that Dr. Duggan merely acted on the basis of what Ms. Kendrick told her. The Seventh Circuit has explained that the "cat's paw" analysis is really just a question of causal links, and the relevant question is whether the termination was the direct result of discriminatory animus by a subordinate making recommendations to the decision-maker. *Lust v. Sealy, Inc.*, 383 F.3d 580, 584 (7th Cir. 2004). Here, that is not the case. Dr. Duggan, one of the decision-makers, made her own personal observations of plaintiff during meetings that followed on the heels of each criticized event; she heard and read his explanations for the use of sarcasm, written consequences and the January 9, 2004 incident – all of which she contemporaneously recorded (Def.'s App. Tab C, Duggan Dep. at 35, 50); and she personally observed plaintiff in the classroom. Thus, the decision by Dr. Duggan to recommend that plaintiff be terminated had independent grounds for which she had personal knowledge, apart from any reports or recommendations made by Ms. Kendrick.

19

Thieme also were not similarly situated to Mr. Truesdale because they did not suffer the same performance deficiencies as plaintiff. The allegations of physical contact between Mr. Inserra and a student were unsubstantiated; the District therefore concluded that the allegations were unfounded (Pl.'s App. X, Claypool Dep. at 65-66). By contrast, Dr. Duggan's report stated that Mr. Truesdale admitted to her that he knowingly pushed the door open, after he knew student Doe I was hunched in front of it with his foot up against it, causing the student to be pushed towards the middle of the hallway (Def.'s Opp. Tab C, Duggan Dep. at 90). As for Mr. Thieme, he offered no basis on which he could say whether his situation was "similar" to that of Mr. Truesdale. Moreover, there is no evidence that Mr. Thieme failed to heed multiple directives from Dr. Duggan or Ms. Kendrick, or that District 207 management was aware that Mr. Thieme used sarcasm with his students.

We pass no judgment on whether District 207 acted wisely in deciding to terminate the plaintiff, because that is not our judgment to make in a discrimination case. *Kruger v. Principi*, 420 F. Supp. 2d 896, 919 (N.D. Ill. 2006). "Ultimately, a plaintiff in an ADEA case must prove that [he] suffered an adverse job action because of [his] age. And when the case is an indirect one, the employer wins if its reasons were not successfully called into question . . .." Hartley, 124 F.3d at 893.[9] That is what has happened here, too. Because plaintiff cannot point to any similarly situated, substantially younger employees who received more favorable treatment and has failed to offer other evidence to create a triable issue of age discrimination, plaintiff has failed to satisfy the fourth element of the *prima facie* case.

---

[9] The Court notes that plaintiff's argument that Mr. Ruedel was replaced six months later (he was actually told he would not be rehired for the following school year at his summative evaluation) with someone who was in his 20s is irrelevant to proof of the fourth factor (Pl.'s Mem. at 5; PSAF Resp. ¶ 10). The circumstances regarding Mr. Ruedel's release had nothing to do with whether the District was discriminating against plaintiff at the time of his release.

## CONCLUSION

IT IS THEREFORE ORDERED that defendant's motion for summary judgment be granted

(doc. # 26-1). This case is TERMINATED.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

**DATED:** August 14, 2006